Lloyd STONE, Jr. *v.* STATE of Arkansas

CR 01-1239 74 S.W.3d 591

Supreme Court of Arkansas
Opinion delivered May 16, 2002

*T.B. Patterson, Jr.*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Lloyd Stone, Jr., appeals his judgment of conviction for manufacture of methamphetamine and his sentence of twenty-seven years. He raises six points on appeal. We reverse on the refusal of the trial court to suppress the evidence seized, and we remand for further proceedings.

For several months, Garland County Sheriff's Department Investigators Corey DeArmon and Danny Wilson had been monitoring Stone's home because they suspected that he was involved in the manufacture or sale of methamphetamine. On the night of September 17, 1998, at approximately 8:30 p.m., the two investigators knocked on the door of Stone's home. They had not obtained a search warrant but had decided to use the "knock and talk" procedure for obtaining a consent to search. When he answered the door, Officer DeArmon asked Stone if they could search the premises. After Stone answered the door, the officers could smell a strong odor which they associated with the manufacture of methamphetamine.

Stone refused to give his consent to search. Instead, he stated that he wanted to call his attorney, Hugh Alexander. He turned around and walked back into the house. When he did so, at least one police officer followed him.[1] It is a matter of some dispute as to why the police officer entered Stone's home. Stone called his attorney, and the police officer listened to his conversation. At one point, Stone put Officer DeArmon on the telephone with Hugh Alexander. What was said in that conversation is also matter of factual dispute. Officer DeArmon testified at the suppression hearing that Stone's attorney advised Stone to consent to the

---

[1] It is unclear from the record whether Officer Wilson entered the house for purposes of Stone's telephone call to his attorney.

search. Alexander disputed this assertion, noting that most of his law practice was criminal defense work and that he would not advise a client to consent to a warrantless search of that client's home. Alexander maintained that Officer DeArmon falsely told him that he and Officer Wilson had already found evidence of the manufacture of methamphetamine taking place in the home. Thus, Alexander claimed, he thought his client was about to be arrested, and he told Officer DeArmon not to question him until he could make it out to the house.

Another area of dispute is whether, after the telephone call, Stone consented to the police officers' search of his home. Stone maintained that he gave no consent. Officer DeArmon, on the other hand, stated that not only did Stone give his consent, he also escorted the police officers around his house and showed them the contraband. All parties agree that Stone was not offered a consent-to-search form. The two police officers found ingredients for making methamphetamine as well as containers they suspected to be involved in the manufacture of methamphetamine. They arrested Stone for attempted manufacture of methamphetamine, and he was later charged with that offense.

Stone moved to suppress the physical evidence seized at his house on the night in question. He argued that he did not give his consent for the officers to enter his home and that he did not give his consent to search the premises. Following a hearing on the motion to suppress, the trial court denied the motion. On April 3, 2000, the State amended the criminal information to change the charged offense from attempted manufacture, a Class A felony, to manufacture, a Class Y felony. The matter proceeded to a jury trial on May 23, 2000. Stone was convicted of manufacture of methamphetamine and sentenced as stated above.

Stone appealed his conviction to the Arkansas Court of Appeals. In an unpublished opinion, the Court of Appeals reversed Stone's conviction under Fourth Amendment principles governing consent to search. *See Stone v. State* (Ark. App. Oct. 24, 2001). The Court of Appeals held specifically that Stone gave no consent for Officer DeArmon's initial entry into his home. The State petitioned for rehearing and argued that any taint of this ille-

gal entry was attenuated by the subsequent consent to search that Officer DeArmon maintained Stone gave him after consulting with his attorney. That petition was denied. The State petitioned for review from the Court of Appeals' decision, and we granted that petition.

We review this case as if the appeal from the judgment of conviction was originally filed in this court. *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001); *Thompson v. State*, 333 Ark. 92, 966 S.W.2d 901 (1998).

## I. Sufficiency of the Evidence

For double jeopardy reasons, we first consider Stone's claim that there was insufficient evidence to support his conviction. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002); *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001). Though we are excluding the methamphetamine seized in this case, the proper disposition is to reverse and remand for the possibility of a new trial. *See Crisco v. State*, 328 Ark. 388, 393, 945 S.W.2d 582, 585 (1997) (supplemental opinion); *Nard v. State*, 304 Ark. 159, 163-A, 801 S.W.2d 634, 637 (1991) (supplemental opinion). Accordingly, the issue of whether sufficient evidence was presented by the State to support the conviction must be considered first, as lack of sufficient evidence would result in a reversal and dismissal of the case.

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000); *Johnson v. State*, 326 Ark. 3, 929 S.W.2d 707 (1996); *Penn v. State*, 319 Ark. 739, 894 S.W.2d 597 (1995). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Williams v. State,* 346 Ark. 304, 57 S.W.3d 706 (2001); *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998); *Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000); *Willett v. State*, 335 Ark. 427, 983 S.W.2d 409 (1998). Substantial evidence

is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Haynes v. State, supra; Thomas v. State,* 312 Ark. 158, 847 S.W.2d 695 (1993); *Brown v. State,* 309 Ark. 503, 832 S.W.2d 477 (1992). Further, this court will not second-guess credibility determinations made by the factfinder. *Hale v. State,* 343 Ark. 62, 31 S.W.3d 850 (2000); *Pyle v. State,* 340 Ark. 53, 8 S.W.3d 491 (2000); *McCoy v. State,* 325 Ark. 155, 925 S.W.2d 391 (1996).

In challenging the sufficiency of the evidence supporting his conviction, Stone specifically argues that the State did not prove that he was manufacturing methamphetamine for anyone's use but his own. He points to the fact that under Ark. Code Ann. § 5-64-101(m), "manufacture" must be manufacture for a use other than one's personal consumption. *See* Ark. Code Ann. § 5-64-101(m) (Repl. 1997). That section reads:

> (m) "Manufacture" means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, *except that this term does not include the preparation or compounding of a controlled substance by an individual for his own use* or the preparation, compounding, packaging, or labeling of a controlled substance . . . . (Emphasis added.)

Thus, "preparation or compounding" of an illegal substance for one's own use does not constitute "manufacture."

This Court has considered personal-use arguments in the context of the manufacture of methamphetamine in prior cases. *See, e.g., Owens v. State,* 325 Ark. 110, 926 S.W.2d 650 (1996). In *Owens,* this Court rejected a personal-use argument and adopted the rationale of the appellate court in a sister state:

> The plain meaning of the exception is to avoid making an individual liable for the felony of manufacturing a controlled substance in the situation where, being already in possession of a controlled substance, he makes it ready for use (i.e., rolling marijuana into cigarettes for smoking) or combines it with other ingredients for use (i.e., making the so-called "Alice B. Toklas" brownies containing marijuana).

*Owens*, 325 Ark. at 124, 926 S.W.2d at 658 (quoting *State v. Childers*, 41 N.C. App. 729, 255 S.E.2d 654 (1979)). The *Owens* decision distinguished between the "preparation or compounding" of a controlled substance for personal use such as the rolling of a marijuana cigarette and the creation of such a substance. *Owens*, 325 Ark. at 124, 926 S.W.2d at 658 (citing *State v. County Court for Columbia County*, 82 Wis. 2d 401, 263 N.W.2d 162 (1978); *People v. Pearson*, 157 Mich. App. 68, 403 N.W.2d 498 (1987)).

■ Here, the State produced sufficient evidence that Stone was indeed manufacturing methamphetamine by means of the necessary ingredients and required apparatus. The personal-use exception does not apply, and Stone's sufficiency argument is without merit.

■ Stone, however, makes an alternative sufficiency argument. He claims that the State failed to prove when any manufacture of methamphetamine took place. The State correctly points out that this argument is made for the first time on appeal. Accordingly, this court will not address it. *Hale v. State*, 343 Ark. 62, 31 S.W.3d 850 (2000).

We affirm the trial court on the sufficiency point.

## II. *Suppression*

Stone's central contention in this appeal is that the search of his home was illegal because he did not give valid consent to enter. Thus, any items seized such as the products used to manufacture methamphetamine constituted the fruit of the poisonous tree and should be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

■ In reviewing a trial court's ruling denying a defendant's motion to suppress, we make an independent determination based on the totality of the circumstances and view the evidence in the light most favorable to the State. We reverse only if the trial court's ruling is clearly against the preponderance of the evidence. *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997); *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997); *Norman v. State*, 326

Ark. 210, 931 S.W.2d 96 (1996); *Bohanan v. State*, 324 Ark. 158, 919 S.W.2d 198 (1996).

■ As an initial matter, Stone argues in his supplemental brief after we granted the State's petition for rehearing that the search and seizure was illegal under the state constitution. We refuse to consider this argument since it was never made to the trial court or to our court of appeals. *See Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002) (declining to address unpreserved state constitutional argument in a knock-and-talk case).

We turn then to Stone's primary argument, which is that his conviction should be reversed under the Fourth Amendment of the United States Constitution. He premises his argument on the fact that he never gave a valid consent to law enforcement officers to enter his home. The State counters that this issue is really one of credibility for the trial court to resolve and that this court should defer to the trial court's finding not to suppress on that basis.

■ A warrantless entry into a private home is pre-sumptively unreasonable under the Fourth Amendment. *Welsh v. Wisconsin*, 466 U.S. 740 (1984); *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002); *Butler v. State*, 309 Ark. 211, 829 S.W.2d 412 (1992). However, the presumption of unreasonableness may be overcome if the law-enforcement officer obtained the consent of the homeowner to conduct a warrantless search. *See Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002) (citing Ark. R. Crim. P. 11.1; *Hillard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995)). This court has established that the State has a heavy burden to prove by clear and positive testimony that a consent to search was freely and voluntarily given. *Holmes v. State, supra*; *Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999); *Scroggins v. State*, 268 Ark. 261, 595 S.W.2d 219 (1980). A valid consent to search must be voluntary, and "[v]oluntariness is a question of fact to be deter-mined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Any consent given must be unequivocal and may not usually be implied. *Holmes v. State, supra*; *Norris v. State, supra* (cit-ing *U.S. v. Gonzales*, 71 F.3d 819 (11th Cir. 1996)).

■ This court recently decided a case that bears some similarity to the one at bar. *See Holmes v. State, supra.* In *Holmes*, we reversed a trial court's suppression decision where police officers followed an individual into a private home with no invitation to do so. Once inside, the officers discovered marijuana. The trial court denied the defendant's motion to suppress. We reversed the suppression decision and said:

> This court had held that consent to an invasion of privacy must be proved by clear and positive testimony, and this burden is not met by showing only acquiescence to a claim of lawful authority. *See, e.g., Martin v. State,* 328 Ark. 420, 944 S.W.2d 512 (1997); *Meadows v. State,* 269 Ark. 380, 602 S.W.2d 636 (1980)). The concept of "implied consent" was examined in *Norris v. State,* 338 Ark. 397, 993 S.W.2d 918 (1999), where this court looked to *United States v. Gonzalez,* 71 F.3d 819 (11th Cir. 1996), and wrote as follows:
>
>> The question of "implied consent" . . . was more closely examined recently in *U.S. v. Gonzalez, supra.* In *Gonzalez,* the officer approached an individual outside her home and asked if she would consent to a search of her home. Following a conversation with her daughter, she told the officer she wanted to go inside and get a drink of water. The officer then told her he "wanted to go in" with her, and when she did not bar him from going in, he followed her inside. The Eleventh Circuit held that there was no consent to enter:
>>
>>> We have previously noted our hesitancy to find implied consent (i.e. consent by silence) in the Fourth Amendment context, and we agree with our colleagues in the Ninth Circuit that *whatever relevance the implied consent doctrine may have in other contexts, it is appropriate to 'sanction entry into the home based upon inferred consent.'*
>>
>> *Gonzalez* then quoted from *U.S. v. Shaibu,* 920 F.2d 1423 (9th Cir. 1990), to which it had referred above:
>>
>>> The government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. "This will not do." *Johnson v. United States,* 333 U.S. at 17. *We must not shift the burden from the government—to show "unequivocal and specific" consent—to the*

> *defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent.*
>
> *Gonzalez*, 71 F.3d at 830; *Norris*, 338 Ark. 409, 993 S.W.2d 918 (emphasis in original).

*Holmes*, 347 Ark. at 538-9, 65 S.W.3d at 865.

To justify the warrantless entry into Stone's home in the case before us, the State underscores one instance in Officer DeArmon's testimony at the suppression hearing when he testified that Stone said, "Come on, I'm going to call my attorney." At several other points in the police officer's testimony, however, he admitted that he was not invited into the home. The relevant part of Officer DeArmon's testimony at the suppression hearing follows:

> DEFENSE COUNSEL: Now, what led you to believe that Mr. Stone had invited you in when he said he wanted to call his lawyer?
>
> OFFICER DEARMON: 'Cause he said "Come on, I'm going to call my attorney." and [I] said "That's fine. I don't care."
>
> DEFENSE COUNSEL: So, he invited you in?
>
> OFFICER DEARMON: Sure, we went just right there in the door, right in the living room right there.
>
> DEFENSE COUNSEL: Why would he invite you in if he wanted to call his lawyer, Mr. DeArmon?
>
> > PROSECUTOR: Objection, calls for speculation. He can't testify as to what somebody else . . .
> >
> > COURT: That's sustained.
>
> DEFENSE COUNSEL: What conversations did you have? When he said he wanted to call his lawyer, did you say then "I'll follow you in" or "I'll step in," or did you just follow him in, Mr. DeArmon?
>
> OFFICER DEARMON: He said "I want to call my attorney." Just like I said, and we walked in the house.
>
> DEFENSE COUNSEL: Well, what right did you have to walk in the house? He didn't say "come in" did he?

OFFICER DEARMON: We walked right there to get the phone.

DEFENSE COUNSEL: Exactly, Mr. DeArmon. It's not in your report anywhere that he invited you in is it?

OFFICER DEARMON: He did not tell us not to come in.

DEFENSE COUNSEL: He didn't tell you to come in either, did he?

OFFICER DEARMON: We did — we's standing right there in the doorway. He was — we were right there in the doorway.

DEFENSE COUNSEL: You entered the house, didn't you, Mr. DeArmon?

OFFICER DEARMON: Yes, I entered the house.

DEFENSE COUNSEL: You entered the house without invitation?

OFFICER DEARMON: No, sir, with invitation. He didn't tell us to stay out.

DEFENSE COUNSEL: Why didn't you report that? Why isn't it written in your report that "Mr. Stone invited us in?" What's in your report is that he — he wanted to call his lawyer.

OFFICER DEARMON: Uh-huh (affirmative).

DEFENSE COUNSEL: And you followed him in. That's not being invited, is it, Mr. DeArmon?

OFFICER DEARMON: I went with him. I mean, he could have went in and got a gun for all I know.

DEFENSE COUNSEL: And he would have every right to do so? He didn't have — he had every right to exclude you from his home.

OFFICER DEARMON: He sure did. At any time.

DEFENSE COUNSEL: Except you followed him in, didn't you?

OFFICER DEARMON: We didn't — we didn't enter the — we walked right there to the doorway where he grabbed the phone, and that's where we did all the discussing.

DEFENSE COUNSEL: But you came inside the door, Mr. DeArmon. Is that correct?

OFFICER DEARMON: Yes, sir. I guess we passed the threshold.

DEFENSE COUNSEL: And he — and Mr. Stone did not say "come in." You followed him. Is that not correct?

OFFICER DEARMON: He said "I want to use the phone." Yes, I guess as your wording is, yeah, that'd be correct.

DEFENSE COUNSEL: Well, not in my wording. Your wording. He never invited you in. He said he wanted to use the phone. He wanted to call his lawyer.

OFFICER DEARMON: Yes, sir.

 We disagree with the State's casting of this issue as merely one of credibility. Under our caselaw, the State must show that in the context of a warrantless entry, the State must prove by clear and positive testimony that the consent to enter and search was unequivocal and specific. *See Holmes v. State, supra; Norris v. State, supra.* That heavy burden has not been met in this case. Officer DeArmon's testimony at the suppression hearing is far from unequivocal. At various times, he says he simply followed Stone into his house and that Stone never invited him in. What is clear is that when Officer DeArmon asked for a consent to search, which Stone declined. Stone then said he wanted to call his attorney. When Stone walked back into his house to do so, Officer DeArmon followed him.

 We hold that the police officer's entry into Stone's home was illegal and not supported by the clear, positive, and unequivocal proof of consent required by our caselaw. We add as a corollary to this holding that were we to sanction a warrantless entry into a home solely based on a police officer's security concerns, we would be allowing that justification to be used for entry into any home under any circumstance. In effect, we would be significantly undermining the search warrant or consent requirement, which we will not do.

 The State next contends that even assuming the police officer's entry was illegal, this defect was cured by Stone's consent to search after his conversation with his attorney. In analyzing this issue, we must determine whether Stone's consent to search was "sufficiently an act of free will to purge the primary taint." *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994) (quoting *Wong*

*Sun v. United States*, 371 U.S. 471 (1963)). Further, the attenuation must be determined by weighing the seriousness of the police misconduct. *Brown v. Illinois*, 422 U.S. 590 (1975). This court has previously held that a lapse of time can dissipate the taint of illegal police conduct. *See, e.g., Mitchell v. State*, 271 Ark. 512, 609 S.W.2d 333 (1980) (a confession given 18 days after an illegal arrest was admissible, because the intervening time period sufficiently dissipated the taint.). We have also held that an intervening event can be an attenuating circumstance. *See, e.g., Brewer v. State*, 271 Ark. 810, 611 S.W.2d 179 (1981) (taint of pretextual arrest attenuated when defendant's girlfriend told defendant that she had already implicated him in the criminal activity).

 In this case, we have neither time nor intervening events to dissipate the taint of Officer DeArmon's illegal entry into Stone's home. There clearly was very little time lapse between the police officer's entry and Stone's consent. The only real question is whether the telephone call to Stone's attorney constituted an event which would cure the illegal entry. We conclude that it did not. There was much confusion and contradictory testimony about what transpired with Stone's attorney. Officer DeArmon was present during the entire telephone conversation and was listening. When the police officer got on the telephone himself, Stone's attorney testified that he was misled by the police officer about what was occurring. Any consent that was given immediately thereafter can not be said to be attenuated from the taint of the illegal entry. As the United States Supreme Court has noted in this regard, the purpose and flagrancy of the violation is always relevant. *See Brown v. Illinois, supra.*

 We hold that Stone's consent to search following the telephone conversation with his attorney was not sufficiently attenuated from Officer DeArmon's illegal entry in the house. The methamphetamine and methamphetamine–manufacturing products seized as a result of the illegal entry and search are the fruit of the poisonous tree and must be suppressed. *Wong Sun v. United States, supra; Holmes v. State, supra.*

The other points raised by Stone (the refusal to grant a continuance, the change in the form of the methamphetamine, the

trial court's interruption of counsel during cross examination, and the failure to give the personal-use instruction) have either been answered in this opinion or are not likely to recur in the event of retrial.

Reversed and remanded.